# State of Vermont v. Gerald A. Lockwood

[632 A.2d 655]

No. 90-067

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed August 30, 1993

548

*Peter R. Neary*, Rutland County Deputy State's Attorney, Rutland, for Plaintiff-Appellee.

*E.M. Allen*, Defender General, and *Anna Saxman*, Appellate Attorney, Montpelier, for Defendant-Appellant.

**Allen, C.J.** Defendant, a mildly retarded adult, appeals from an order of the district court revoking his probation. He claims that (1) his probation warrant should be declared void because he lacked the capacity to sign it, or that it not be enforced because of the doctrine of impossibility, (2) the court erred by revoking probation without holding an additional competency hearing and without notifying defendant's protective services guardian, (3) warrantless searches of his living quarters and person by probation officers violated his constitutional privacy rights, and (4) a probation condition prohibiting possession of photographs of children violated his freedoms of speech and religion. We affirm.

In 1986, defendant was charged with sexually assaulting a four-year-old girl. In February 1987, after evaluation and hearing, he was found competent to stand trial. After additional evaluation and a hearing in December 1987, the court again found defendant competent to stand trial. The court concluded that defendant had a firm knowledge of the facts concerning his actions and whereabouts, that he was able to assist his attorney in locating and examining witnesses, that he was able to discern distortions and misstatements in testimony, that he could make decisions in response to carefully explained alternatives concerning his defense, that his comprehension improved with explanation, and that there was no indication that his condition would worsen under the stress of trial.

Prior to the second competency proceeding, the court granted defendant's petition for protective services pursuant to 18 V.S.A. §§ 9301–9317. The court found that he was unable to provide for his own needs and appointed a protective services worker. The court further found that defendant had "no understanding of the concept of a contract or any of the implications involved in entering into a contract."

In January 1988, pursuant to a plea agreement, defendant pled nolo contendere and was sentenced to serve three-to-eight years. The court suspended all but 153 days and placed defendant on probation with special conditions that prohibited him from possessing dolls, dolls' or children's clothing, and pictures of children. In February 1989, probation officers and a state police officer searched defendant's room and workshop at his supervised residence and found a knife, dolls, children's clothing, and hundreds of pictures of children. In March 1989, while the resulting violation of probation was pending, defendant pled nolo contendere to a charge of lewd and lascivious conduct for exposing himself to young girls. For that offense, he received a sentence of zero-to-four years, all suspended. For the violation of probation, he was sentenced to serve the original underlying term of three-to-eight years, all suspended but 161 days with credit awarded for 153 days already served. New conditions were added to defendant's probation warrant, including that he not possess any firearm or other deadly weapon and that he submit to a "body, clothing, [and] residential search as required."

Defendant signed his probation warrants after both sentencings and initialed each condition following explanation by a probation officer. His protective services worker was not present when he signed the warrant. The court found that defendant understood his probation conditions when imposed and that those conditions were given significant attention during the pendency of his probation. For example, at all weekly meetings with defendant, his probation officers read each special condition, explained its meaning, and discussed it with him. On each visit, they required him to write out his "rules" until they were committed to memory. Once defendant was placed in a private residential setting in early 1989, his supervisor, who has a master's degree in education and counseling, reviewed defendant's special conditions with him daily and emphasized that his living quarters and workshop area were subject to frequent, unannounced searches.

After defendant displayed symptoms similar to those exhibited prior to his earlier violation of probation—refusing to perform tasks, complaining about restrictions, and displaying general agitation—his supervisor searched defendant's workshop area looking for pictures of children. In defendant's file cabinet, the supervisor found a fully operational pistol with clips and ammunition, which had been left elsewhere in the residence a year earlier by an acquaintance of the supervisor. Probation officers then searched defendant's living quarters and workshop area. They found photographs of female children, magazines and newspapers with pictures of young children, a child's T-shirt, a doll's cap, children's records, a wrench, a chain, a hand gardening tool, a ten-inch drill bit, a plastic covered braided wire, and single-edged razor blades. A probation officer strip-searched defendant but found nothing.

In connection with his revocation hearing, defendant moved to suppress introduction of physical evidence, arguing that the warrantless searches violated his constitutional privacy rights. He also moved to suppress statements he made, arguing that he had not waived his right to remain silent and to consult with an attorney. The court denied these motions, concluding that the state's interest in protecting the community permitted a degree of encroachment on defendant's privacy rights, that defendant had consented to the search when he signed his probation war-

rant, and that he had not been in custody when the statements were made. In December 1989, the court found that defendant had violated three conditions of his probation and later sentenced him to serve both underlying sentences of three-to-eight and zero-to-four years consecutively.

## I.

Defendant raises two contract-based challenges to the validity of his probation warrant. Defendant first argues that a probation warrant is a contract, which in this case was void and unenforceable because it was not signed by the protective services worker to whom the court had delegated defendant's power to contract. We disagree.

The provisions of 18 V.S.A. § 9310(a)(2), which grant a guardian "power to approve or withhold approval of any contract . . . which the retarded person wishes to make," do not require the guardian's signature on a defendant's probation warrant. Although we have termed probation warrants "contracts," *State v. Whitchurch*, 155 Vt. 134, 139, 577 A.2d 690, 693 (1990), the purposes of a probation warrant illustrate its difference from an ordinary contract. A probation warrant serves to give a defendant fair notice of what conduct may constitute a probation violation, thereby resulting in defendant's loss of liberty. *State v. Peck*, 149 Vt. 617, 619, 547 A.2d 1329, 1331 (1988). Section 9310(a)(2), however, refers to contracts that "the retarded person wishes to make." Here, defendant chose to plead guilty and accept probation to avoid possible incarceration. Although defendant may have "wished" to make the probation contract with the court, his choice was forced and the result of his criminal conduct. We conclude that a probation warrant is not the type of contract contemplated by § 9310(a)(2).

Second, defendant argues that he lacked the ability to comprehend or comply with his conditions of probation; therefore, performance of the probation warrant was impossible from the outset, and this Court should not enforce the contract.[1] As

---

[1] The dissent states that this opinion "glosses over the real issue presented—whether defendant was competent to enter into guilty pleas and probation warrants." The United States Supreme Court has recently decided that the

stated above, a probation warrant differs from an ordinary contract. Moreover, the evidence does not support defendant's argument that the performance of the warrant was impossible. Instead, the court took pains to fashion unique probation conditions that were suited to defendant's particular situation in order to create the best chance for his rehabilitation. Moreover, as previously noted, the probation officers repeatedly discussed these conditions with defendant and helped him commit them to memory.

■ Nor does defendant's alleged inability to comply with the conditions at the time of the violation bar revocation of his probation. Probation is intended to allow a defendant an opportunity for rehabilitation at the same time it protects society. See *United States v. O'Sullivan*, 421 F. Supp. 300, 302 (S.D.N.Y. 1976) (despite rehabilitative purposes of probation, it will be revoked if defendant is a danger to society). The purpose of a revocation hearing is not to determine defendant's culpability, but rather to decide "whether the alternatives to incarceration which have been made available to a defendant remain viable for him." *People ex rel. Gallagher v. District Court*, 591 P.2d 1015, 1017 (Colo. 1978) (en banc). Revocation will result when the continuation of probation conditions would be at odds with the need to protect the public and society's interest in rehabilitation—in other words, when the rehabilitative purposes of probation have failed and defendant is a threat to society. *Trumbly v. State*, 515 P.2d 707, 709 (Alaska 1973); *People v. Allegri*, 487 N.E.2d 606, 607 (Ill. 1985); *State v. Hutchison*, 580 N.E.2d 34, 36 (Ohio Ct. App. 1989); see 28 V.S.A. § 303 (stating grounds for revocation). Thus, many courts have ruled that a plea of not guilty by reason of insanity is not a defense in probation revocation hearings because defendant's personal culpability is not at issue. See, e.g., *Trumbly*, 515 P.2d at 708–09

---

competency standard for pleading guilty is the same as the competency standard for standing trial. See *Godinez v. Moran*, — U.S. —, —, 113 S. Ct. 2680, 2686 (1993). Defendant has not provided any reasons why the Vermont Constitution's due process protections would guarantee a higher standard of competency; therefore, defendant has waived the issue because it has not been squarely raised before this Court. See *R. Brown & Sons, Inc. v. International Harvester Corp.*, 142 Vt. 140, 142, 453 A.2d 83, 84 (1982) (issues not briefed on appeal are waived).

(insanity defense irrelevant in probation revocation hearing); *People v. Breaux,* 161 Cal. Rptr. 653, 657 (Ct. App. 1980) (insanity not a defense to probation violation, but relevant to probation revocation or modification); *People ex rel. Gallagher,* 591 P.2d at 1017 (sanity a factor only in determining continued availability of probation); *Allegri,* 487 N.E.2d at 608 (insanity defense has no bearing on relevant issue of whether defendant a danger to society); *Hutchison,* 580 N.E.2d at 36 (issue in revocation hearing is whether probation should remain available, not whether defendant responsible for acts alleged). If a defendant's subsequent inability to comply with a probation condition barred revocation, this effectively would limit a sentencing court's flexibility to fashion appropriate probation conditions. Courts would sentence defendants to unnecessary periods of imprisonment whenever there appeared to be a risk of violation because of questionable ability to comply. *Allegri,* 487 N.E.2d at 609.

Although defendant's alleged inability to comply with the conditions at the time of violation does not bar revocation, his mental ability is a relevant factor in deciding whether the continuation of his probation will be at odds with the need to protect society. See *State v. O'Meal,* 569 P.2d 249, 251 (Ariz. Ct. App. 1977) (time of probation violation relevant to viability of continued probation); *Breaux,* 161 Cal. Rptr. at 657; *People ex rel. Gallagher,* 591 P.2d at 1017. In this case, the court took defendant's mental capacity into consideration at the revocation hearing. The court's decision was not an abuse of discretion. See *State v. Therrien,* 140 Vt. 625, 627, 442 A.2d 1299, 1301 (1982) (if violation is established, court has discretion to revoke probation and impose original sentence under 28 V.S.A. § 304).

## II.

Defendant raises two issues regarding the revocation hearing. First, he argues that the trial court erred by subjecting him to revocation proceedings without notice to, or the presence of, his protective services worker.

A judge found defendant competent to stand trial in December 1987 following extensive evaluation and a contested hearing. At the time of that hearing, the judge was fully aware of

defendant's need for protective services because he himself had appointed a protective services worker in May 1987 after concluding that defendant was unable to provide for his own needs. We agree with the judge's implicit conclusion that defendant's need for protective services, as determined pursuant to 18 V.S.A. § 9309, could not bar his full participation in criminal proceedings when, as here, a defendant is subsequently found competent to stand trial.

■ Once defendant was found competent to stand trial and face criminal consequences for his conduct, due process considerations precluded the involvement of his protective services worker. See *State v. Ladd*, 139 Vt. 642, 644, 433 A.2d 294, 295 (1981) (retention of guardian ad litem for competent adult violates defendant's due process rights). The protective services proceedings did not alter the finding of competency because the two proceedings relied on distinct criteria. Protective services focus on a mentally retarded person's need for supervision and protection. 18 V.S.A. § 9309(e)(4). In contrast, a competency determination measures whether a defendant is capable of understanding the criminal proceedings and consulting with an attorney. *Godinez v. Moran*, — U.S. —, —, 113 S. Ct. 2680, 2685 (1993). Moreover, a criminal proceeding, including a revocation hearing, is not the type of "judicial action" which a guardian may "commence or defend" under 18 V.S.A. § 9310(a)(3), and consequently, the statute does not provide for the guardian's participation in defendant's criminal proceeding. There was no error.

Second, defendant argues that the trial court erred by failing to conduct a new competency hearing before commencing the revocation proceeding. We find no error in the court's decision to rely on the prior finding of competency because the court had no indication of the need for a new determination.

■ The trial court has a duty to order a psychiatric examination and conduct a competency hearing if there is "reason to believe that [the defendant] may be incompetent to stand trial." 13 V.S.A. § 4817(b). Moreover, the same standard of competency applies to defendants who stand trial as to those who plead guilty. *Moran*, — U.S. at —, 113 S. Ct. at 2686. Once a defendant has been found competent, the trial court must be

alert to changed circumstances that would indicate the need for a new determination of competency. *Drope v. Missouri*, 420 U.S. 162, 181 (1975).

■ Here, the court had no indication before it of any change warranting a new competency hearing. The court considered the issue and concluded that it would leave the earlier determination of competency in place "absent something more than [defense counsel's] feeling about it." In finding defendant competent in December 1987, the court concluded that his comprehension improved with explanation. The evidence demonstrated that between 1987 and the revocation proceeding defendant received extensive explanation regarding his conditions and the consequences for violating them. Although defense counsel told the court that she had trouble communicating with defendant, she did not point to any changed circumstances that would have indicated to the court the need for a new inquiry into defendant's competence, and we can find no such indication in the record. Cf. *State v. Pierce*, 569 P.2d 865, 869 (Ariz. Ct. App. 1977) (nothing in record to support need for second competency inquiry prior to sentencing); *State v. Heral*, 342 N.E.2d 34, 38 (Ill. 1976) (record did not reflect changed circumstances that would have alerted trial judge to need for new competency hearing). Moreover, defense counsel never requested a new competency hearing prior to the revocation proceedings. We conclude that the court did not err when it decided not to order a third competency hearing prior to commencing revocation proceedings.

## III.

Defendant claims that the warrantless searches of his living quarters and person violated rights guaranteed by the Fourth Amendment to the United States Constitution[2] and Chapter I, Article 11 of the Vermont Constitution.[3] Preliminarily, defend-

---

[2] The Fourth Amendment states, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."

[3] Article Eleven states: "That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation . . . ought not to be granted."

ant argues that he was not competent to waive his privacy rights when he signed his probation warrant. We need not rule on this issue because, unlike the trial court, we do not rely on defendant's consent to his probation terms. Even when a probationer signs a blanket condition agreeing to future searches, he may continue to enjoy residual privacy rights deserving some constitutional protection. Cf. *State v. Emery*, 156 Vt. 364, 369, 593 A.2d 77, 79 (1991) (probationers are subject to restrictions not imposed on ordinary persons, but only to the extent they serve the ends of probation).

The United States Supreme Court has held that searches of probationers' homes pursuant to a state regulation are permissible under the Fourth Amendment where the officer possesses "reasonable grounds" for the search. *Griffin v. Wisconsin*, 483 U.S. 868, 872 (1987). In such situations, the search need not satisfy the higher probable cause standard.[4] *Id.* at 873. The Court applied this lesser standard because it acknowledged that the special needs of the state in administering probation require balancing the rehabilitative needs of probationers against concerns for protection of the community. *Id.* at 873–74.

Here, probation officers acted pursuant to a condition of probation rather than a state regulation. As this Court has noted, however, when probation conditions are "supported by the findings and are narrowly tailored to fit the circumstances of the individual probationer . . . probation searches based on reasonable suspicion can have the same indicia of reasonableness as the search upheld in *Griffin*." *State v. Moses*, 159 Vt. 294, 304–05, 618 A.2d 478, 484 (1992) (citations omitted). Such specific and narrowly tailored probation conditions provide guidance to probation officers similar to that provided by the regulatory scheme in *Griffin*. *United States v. Giannetta*, 909 F.2d 571, 575 (1st Cir. 1990).

---

[4] In Vermont, the standard for probable cause resembles the reasonable grounds test adopted here. *State v. Towne*, 158 Vt. 607, 613–16, 615 A.2d 484, 488–89 (1992) (rejecting "more likely than not" standard and holding that probable cause can be based on the reasonable inference of criminal behavior). The important inquiry is whether the determination of reasonable grounds should have been made by the officers who searched, or rather by a "neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 15 (1948).

Ideally, the probation condition itself will limit the search to the specific requirements for the supervision of the particular defendant. See *United States v. Schoenrock*, 868 F.2d 289, 291–92 (8th Cir. 1989) (where defendants pled guilty to conspiracy to distribute cocaine, probation condition allowing warrantless searches was limited to submission to chemical testing for drugs and random searches for alcohol and controlled substances). In some instances, however, such narrow probation conditions are not appropriate or possible. The United States Court of Appeals for the First Circuit upheld a search based on a probation term that required that the defendant "at all times during his period of probation, readily submit to a search of his residence . . . by his supervising probation officer, upon the officer's request." *Giannetta*, 909 F.2d at 573. The court held that the defendant's guilty plea to the complex offense of drug trafficking and his admitted strong attraction to the excitement of crime posed "more than an average risk that [the defendant] would revert to his prior criminal ways." *Id.* at 575–76. Because of this high risk of recidivism, the trial court had expressed concern that the defendant be subject to rigorous scrutiny when it imposed the probation condition.

As in *Giannetta*, in this case there was ample evidence that defendant posed "more than an average risk" of repeating his offense. The court emphasized that defendant's chance for repeating his offense was high because of the dual nature of his condition: mental retardation and sexual deviancy. The combination of these two factors resulted in compulsive sexual behavior without awareness of the consequences of this behavior. Moreover, defendant had been sexually abused as a child.

The plea agreement hearing focused on defendant's need for a special rehabilitation program in the absence of an appropriate program for mentally retarded sex offenders. All of the witnesses at the hearing noted the concern of protecting society from the high risk that defendant would repeat the offense. As one witness stated, "[Defendant] will be aroused by children the rest of his life . . . . [W]e do not expect to cure his compulsive behavior." Instead, the focus of the rehabilitation would be to teach defendant to control his compulsive urges. The court stated: "The Department of Corrections is going to be asked to supervise this defendant. It seems to me that we're putting the

department in an extremely difficult position to ask them to supervise someone who has a definite need and yet not to give them the resources." Thus, the evidence of the high risk that defendant would repeat his offense supported the condition allowing a search by the probation officer.

Moreover, the court's expressed concerns regarding defendant's compulsive sexual urges provided guidance to the probation officer as to the purposes of any search that would be conducted. See *Giannetta*, 909 F.2d at 575–76. These findings provided sufficient guidance to the officers conducting the search to meet the test set forth in *Moses* that the condition be narrowly tailored to fit the circumstances of the individual probationer.

■ The probation condition, however, on its face allowed a search by the probation officer with or without reasonable suspicion. This error could invalidate the probation term under *Griffin*. The same flaw in the probation condition was present in *Giannetta*. *Id.* at 576. This Court adopts the holding in *Giannetta*, which states: "Although this flaw theoretically renders the probation search condition overbroad, the absence of a reasonableness limitation is not objectionable so long as the decision to search was in fact narrowly and properly made on the basis of reasonable suspicion . . . ." *Id.* Under *Griffin*, the officers must have had "reasonable grounds" to conduct the searches. *Griffin*, 483 U.S. at 872. In the present case, defendant's agitation—similar to behavior he exhibited prior to his earlier probation violation—triggered the initial search by his supervisor. Once she found the gun, which defendant subsequently denied having, the probation officers had more than reasonable grounds to conduct a thorough search of his living quarters. Thus, although the probation condition in this case is flawed, this error was overcome because the officers had reasonable suspicion to conduct the search, and these searches did not violate defendant's Fourth Amendment rights.

Defendant also argues that his Fourth Amendment rights were violated by the officers' strip search of his person. We need not reach this issue as no evidence was produced from this search.

Defendant asks this Court to construe Chapter I, Article 11 of the Vermont Constitution to require a warrant for the

searches of his home and person. Although we are mindful that limits must be placed on such searches and that consent to future searches "as required" does not permit unfettered intrusions into the private lives of probationers, we find that the "reasonable grounds" standard establishes the proper safeguard. We are persuaded by the reasoning of *Griffin*: that the special needs of the state in administering its probation program creates an exception to the warrant requirement and permits a degree of "impingement upon privacy that would not be constitutional if applied to the public at large." 483 U.S. at 875.

Despite the absence of the word "unreasonable" from the text of Article 11, it has been construed consistently to forbid only unreasonable searches and seizures; reasonable searches are constitutionally permissible. *State v. Record*, 150 Vt. 84, 85–86, 548 A.2d 422, 423 (1988). A warrantless search may be reasonable: "Article Eleven does not mandate an absolute prohibition against searches and seizures undertaken without a proper warrant." *Id.* We apply the reasonableness standard here, but decline to require a warrant because the terms of probation and the court's expressed concerns provided sufficient guidance to the probation officers regarding the purposes and parameters of allowable searches.

We have previously held that in the prison setting, in which special needs of the state make the warrant and probable cause standard impracticable, the state must adhere to certain administrative safeguards to protect the residuum of inmate privacy. *State v. Berard*, 154 Vt. 306, 314, 576 A.2d 118, 122–23 (1990) (mandating administrative guidelines to govern routine, random, warrantless searches of inmates). While the privacy rights of probationers are arguably greater than those of inmates, the needs of the state in administering probation, as opposed to a correctional facility, remain strong. Without walls, the probation system strives to protect the public while it attempts to rehabilitate its participants. We hold that, if a probation term provides for warrantless searches and the terms of probation are narrowly tailored to fit the circumstances of the individual probationer, the *Griffin* "reasonable grounds" standard strikes the proper balance between probationer privacy rights and public protection concerns. If officers have reasonable grounds, as they did here, to conduct a search under the

authority of a condition of probation, Article 11 does not require a search warrant.

## IV.

Defendant argues for the first time on appeal that the condition of probation that prohibited him from possessing "any photographs of children under the age of 18" violated his freedoms of speech and religion guaranteed by the First Amendment to the United States Constitution and Chapter I, Article 13 of the Vermont Constitution. Because defendant failed to raise this issue below, we confine our analysis to plain error. *State v. Mace*, 154 Vt. 430, 436, 578 A.2d 104, 108 (1990) (absent plain error, this Court will not consider probationer's constitutional claims raised for the first time on appeal). We find none.

■ ■ "Probation conditions may impact upon a probationer's First Amendment rights so long as the conditions have a reasonable nexus with rehabilitation of the defendant and protection of the public." *Id.* The court has broad discretion in setting conditions of probation, 28 V.S.A. § 252(a), and may require a probationer to satisfy "any . . . conditions reasonably related to his rehabilitation." *Id.* § 252(b)(13). Here, an expert testified that people with defendant's problems often collect pictures of children because they are "extremely important to what sexually turns them on." He further testified that defendant had "extreme difficulty" controlling his sexual behavior relative to children. We find the disputed condition reasonably related both to defendant's rehabilitation and protection of the public. Moreover, the condition was not "unduly restrictive of [defendant's] liberty or autonomy," *Whitchurch*, 155 Vt. at 137, 577 A.2d at 692, as we can find no evidence that he retained the pictures for religious or expressive purposes.

*Affirmed.*

**Johnson, J.,** dissenting. Although one may question whether judicial institutions are always the most appropriate or effective ones for dealing with society's most intractable problems, for better or for worse, that is where many of them come for resolution. If we are to have any success at all in such cases, we need, at a minimum, to bring a perspective whose breadth is

equal to the scope of the problem. In this case, which concerns a mentally retarded sex offender, the majority has applied a narrowly focused analysis that glosses over the real issue presented—whether defendant was competent to enter into guilty pleas and probation warrants that imposed specific, highly restrictive conditions. In my view, the majority's approach dooms us to the perpetuation of antiquated, illogical and ultimately, unjust modes of treatment for individuals whose problems demand solutions that are uniquely sensitive to their special needs.

A year before the guilty plea underlying the current probation warrant, and two years before the probation revocation hearing, defendant had been found, at best, marginally competent to stand trial on unrelated charges. This marginal competence decision is now held to validate all further judicial proceedings with respect to this defendant. In my opinion, a very different process should have occurred in this case, one that included a context-specific inquiry directed at defendant's competence to plead guilty, enter into a probation agreement and understand its conditions. Because no such inquiry took place, the probation warrant underlying the revocation should be found invalid and unenforceable. The fact that compliance with the probation warrant was not "facially impossible" is simply irrelevant if defendant lacked competence to enter into its terms. In addition, defendant's competence should have been reconsidered before his trial on the probation violations that are the subject of this appeal.

I.

In order to appreciate fully the issues presented by this case, a more thorough explication of the facts than appears in the majority opinion is necessary.

A.

First, the procedural history is complex. Defendant committed a sexual assault on a minor. He was found competent to stand trial.[1] Later, a plea agreement was negotiated on this

---

[1] Defendant had previously been found incompetent to stand trial in unrelated proceedings.

charge, but defense counsel questioned whether defendant was competent to enter a plea. Another competence hearing was held, and in December 1987, defendant was found competent to stand trial and permitted to enter a plea of guilty in January 1988. He received a split sentence, with a very short jail term and a long period of probation in a closely supervised residential setting. Commencement of the sentence was delayed a few weeks and, shortly before he was to begin his jail time, defendant committed lewd and lascivious conduct. He pled guilty to this offense, but not until a year later, in March 1989. At that time, he also pled guilty to a violation of probation based on possession of a knife. On the basis of these pleas, he received another sentence, consecutive to the earlier sentence, but suspended, and he entered into a new probation warrant that incorporated the old conditions and added numerous, and much more specific, conditions, including the prohibition that he not possess pictures of children, dolls and doll's clothing. In April 1989, within a month after entry of the conditions, he was found in "possession" of a gun, tools that were considered "deadly weapons," dolls (the kind of action figures so popular with defendant's mental age group), see part I.B. *infra*, and magazines and newspapers with children's pictures in them, all in violation of probation. After a hearing, he was found in violation of his probation and sentenced to serve the remainder of the two consecutive sentences. It is from this conviction that defendant appeals.

## B.

The critical facts in this case concern defendant's ability to understand the proceedings against him. Defendant is mentally retarded. His I.Q. has been tested at 66, which is described as "mildly, mentally retarded" or "educable." These terms, however, belie defendant's ability to function in society. He cannot read. His ability to reason abstractly is severely impaired. As an examining psychiatrist put it, defendant's understanding of words is "almost totally concrete." He probably functions below a third grade level. In practical terms, he is only minimally able to care for his personal needs; he does not engage in regular grooming tasks, and does not understand his basic health needs. He cannot handle his own finances. Although he has re-

ceived considerable assistance from mental health services organizations, he does not have the ability to maintain and follow up on these services when necessary. As found by the trial court that granted his petition for a protective services worker, he has "no understanding of the concept of a contract or any of the implications involved in entering into a contract."[2]

### C.

As previously noted, defendant's competence was determined twice, with both hearings taking place before his plea to the original sexual assault charge. The second hearing, held in November and December 1987, purported to consider whether he was competent to enter a plea; but the court, in accordance with the prevailing law at the time, assessed defendant's competence as if he were to stand trial. The court heard some testimony from defendant on his understanding of the choices between trial and plea, but it is fair to say that the inquiry revolved around the usual questions—whether defendant had a firm knowledge of the facts concerning his actions and whereabouts, whether he was able to assist his attorney in locating and examining witnesses, and whether he could make decisions about his defense in response to carefully explained alternatives. Whether defendant had the capacity to understand and comply with the conditions ultimately imposed on him was not an issue at this or any other hearing.

Defendant's testimony in the second competence hearing reveals the depth of his difficulties in understanding the proceedings in which he was involved. He was unable to answer any truly nonleading basic question about the judicial system and the operation of a trial. He thought a trial is when "everybody gets together." He could parrot what others told him, but it was momentary. When asked follow-up questions that would have demonstrated an understanding of the subjects just discussed with him, he could not respond. He could not answer why he had been evaluated by one of the psychiatrists, Dr. Payson. He had

---

[2] I agree with the majority that it is inappropriate to use contract theories to analyze the legal incidents of a probation warrant. The ability of defendant to understand the concept of a contract is relevant here, however, because a probation warrant, like a contract, is essentially a statement of a legally enforceable obligation.

virtually no concept of time, especially as related to his probable sentence. He thought three to eight was the same as thirty-eight. The only definite conclusion that one could draw from defendant's testimony was that he was terrified of going to jail.

Complicating the competence issue for the trial court was the fact that three examining psychiatrists largely agreed on defendant's functional problems, but used different standards to translate those problems into a legal conclusion. On one end of the spectrum, Dr. Kron considered the issue of competence as a fairly straightforward, uncomplicated matter that consisted of asking people "what they're being charged with, are they able to cooperate with counsel, and [do] they understand the procedures, the mechanics of the courtroom." On the other, Dr. Payson, the only psychiatrist to recommend that defendant be found incompetent, viewed legal competence as more in the nature of the standard enunciated in *Dusky v. United States*, 362 U.S. 402 (1960). Dr. Payson stated the "information available to me and the other experts does not support a decision that [defendant] can communicate meaningfully with his lawyer so as to be able to make informed choices regarding trial strategy. [He does not have] capacity for rational . . . understanding of the proceedings against him." Only Dr. Taylor was candid about the uneasy intersection of law and psychiatry. As he pointed out, "I regret being ordered to be conclusory in cases which are so clearly in the gray area. I have little way of knowing how courts balance the privilege of trial against fairness doctrines. My knowledge of law is irrelevant and incompetent. The disagreeing evaluators are using the same observations, and surely the disagreement is not in psychiatry but rather in the imprecise definition of competency, which is a legal matter."

Upon this evidence, defendant was found competent to "stand trial," although he intended to plead guilty. At the plea hearing, a cursory V.R.Cr.P. 11 colloquy was held in which defendant answered that he "understood" the meaning of pleading guilty. The competence decision, as the trial judge acknowledged, was a difficult one, given the conflicting evidence and at least one previous finding of incompetence.[3] But it is this

---

[3] By finding defendant competent to stand trial, the court was able to impose a split sentence with a short period of incarceration, followed by probation in

borderline decision that was relied on by the trial court, and now the majority, to support a plea of guilty to new charges, a probation violation a year later, and a hearing on new probation violations two years later.

## II.

## A.

In an adversary system of justice, it is fundamental that the conviction of a mentally incompetent person is a violation of due process. *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975); *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The test for assessing competence originated in the common law and is now codified in federal and state statutes. See generally Note, *Incompetency to Stand Trial*, 81 Harv. L. Rev. 454, 457–59 (1967). Vermont statutes do not set forth any particular test for determining competence,[4] but the test approved by the United States Supreme

---

a private, residential setting with conditions directed at some rehabilitation. In hearings related to this matter, the court expressed concern that jail was an inappropriate setting for defendant, in part because of the potential victimization by others, but also because defendant's cognitive deficiencies would preclude his participation in sex-offender treatment programs operated by the Department of Corrections. In fashioning its own disposition, the court here acted in default of the Commissioner of Mental Health, and, in my view, reached an erroneous competence decision to do so. It is the Commissioner who is charged by the statutes to provide appropriate custody, care and habilitation to mentally retarded individuals who are a danger to others, as long as the Commissioner has a designated program. 18 V.S.A. §§ 8839, 8843(c). The Commissioner has no program for mentally retarded sex offenders, and in a recent case, claimed it is too expensive to provide individual programs. *In re D.C.*, 159 Vt. 314, 319, 618 A.2d 1325, 1328 (1992). I do not fault the court for its efforts in crafting a creative solution, but given defendant's cognitive difficulties, the ultimate and certain result was defendant's incarceration for the majority of two consecutive sentences.

[4] Few Vermont cases have actually stated a standard for competence. In *In re Russell*, 126 Vt. 240, 243, 227 A.2d 289, 290 (1967), the Court noted that a defendant with a mental disability must be found by the court to "comprehend the nature of the proceedings against him and participate rationally in the decisions relating to his own defense." See also *State v. Williams*, 154 Vt. 76, 79, 574 A.2d 1264, 1265–66 (1990) (defendant was competent if he could understand the nature of the charges against him and was able to assist intelligently in his defense).

Court is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. It is not enough that a defendant is oriented to time and place and has some recollection of the events. *Id.* The focus is on a defendant's *capacity* to understand the nature of the proceedings against him so that he may make a rational defense. Note, *Incompetency to Stand Trial, supra*, at 457.

Today, the majority implicitly adopts the prevailing view, recently endorsed by the United States Supreme Court in *Godinez v. Moran*, — U.S. —, 113 S. Ct. 2680 (1993), that a defendant found competent to stand trial is competent for all other judicial proceedings, including the entry of guilty pleas.[5] *Id.* at —, 113 S. Ct. at 2686. The rationale for this view is that during trial defendant may be required to waive important constitutional rights and that these rights are similar to the rights a defendant waives in pleading guilty. Therefore, the argument goes, once a defendant is found competent to stand trial—a conclusion that is formulated largely by finding out if defendant has a knowledge of the facts, can assist his attorney in locating and examining witnesses, and can make decisions in response to carefully explained alternatives—he is, ipso facto, able to understand the significance and consequences of a guilty plea, and enter into a probation warrant. The Supreme Court in *Moran* then requires, after a finding of competence to stand trial, a "second-tier" inquiry for the entering of a guilty plea: whether the waiver of defendant's constitutional right to trial is intelligent and voluntary. *Id.* at —, 113 S. Ct. at 2687.[6] According

---

[5] The majority's explicit holding is that compliance with the warrant is not facially impossible. This implies the intermediate, but unstated, holding that a finding of competence to stand trial presumes that defendant is competent to participate in all other stages of the judicial process, and will be able to comprehend and comply with the conditions imposed upon him, as long as they are not facially impossible.

[6] The Court in *Moran* distinguishes a finding of *competence* to stand trial, which it defines as the defendant's ability to understand the proceedings, from a finding that a voluntary and intelligent waiver of constitutional rights was made, for which inquiry as to whether "the defendant actually *does* understand the significance and consequences of a particular decision"

to the *Moran* majority, "[i]n this sense there *is* a 'heightened' standard for pleading guilty . . ., but it is not a heightened standard of *competence*." *Id.* (emphasis in original).

*Moran* deals with a mentally ill, not a mentally retarded, defendant. It is not clear whether the standard it adopts would also be applied by the United States Supreme Court in cases concerning the competence of defendants who are mentally retarded. In any case, for reasons set forth below, I find the logic of its argument fatally flawed, and I would reach a different result in this case, analyzing defendant's due process rights under the Vermont constitution.[7]

Even prior to *Moran*, a few courts had challenged the prevailing view that competence to stand trial is sufficient to support a guilty plea. *United States v. Masthers*, 539 F.2d 721, 726 (D.C. Cir. 1976); *Sieling v. Eyman*, 478 F.2d 211, 214 (9th Cir. 1973). This minority view was concerned with the finality of the guilty plea and its attendant consequences. See *Masthers*, 539

---

is required. *Moran*, — U.S. at — n.12, 113 S. Ct. at 2687 n.12 (emphasis in original).

[7] The majority states that it does not reach the competence issue under our state constitution because defendant "waived the issue because it was not squarely raised before this Court." Defendant did raise competence issues under the Vermont Constitution in his original brief, albeit in a cursory fashion. His shortcoming, if any, is inadequate briefing. Although we have sometimes declined to reach issues for that reason, I believe that it cannot be justified in this case. In *State v. Jewett*, 146 Vt. 221, 500 A.2d 233 (1985), we recognized that we have an obligation "when state constitutional questions of possible merit have been raised, *to address them or order that they be rebriefed* when the briefs do not pass muster." *Id.* at 229, 500 A.2d at 238 (emphasis added). At a minimum then, this Court always has discretion to reach state constitutional issues that are squarely raised.

Moreover, even taking a narrower view, it is particularly inappropriate to decline to reach the state constitutional issue in this case. After defendant raised competence issues under both the federal and state constitutions, we ordered additional briefing specifically to address whether the standard of competence to stand trial is the same as the standard of competence to plead guilty and whether a finding of competence to stand trial may support, without further inquiry, a plea of guilty. We did not specifically direct the parties to brief this question under the Vermont Constitution, but having made the request as we did, if the majority is dissatisfied with the response, it should not now simply ignore the question. At the least, the court should order additional briefing and meet headlong the issue it has defined. For myself, I am satisfied that the record and the briefing allow us to address the matter without further proceedings.

F.2d at 725 (guilty plea is a conviction and as conclusive as a jury verdict). Implicit in their argument was that, if there is not to be a fair trial of the issues, then courts must assure themselves, by some degree of heightened scrutiny regarding competence, that the defendant who pleads guilty is making a "reasoned choice." *Sieling*, 478 F.2d at 215; see also *Schoeller v. Dunbar*, 423 F.2d 1183, 1194 (9th Cir.) (Hufstedler, J., dissenting) (defendant is not competent to plead guilty if mental illness has impaired his ability to make a reasoned choice), *cert. denied*, 400 U.S. 834 (1970). In effect, the minority view raised the level of scrutiny by elevating the level of competence required to plead guilty. This approach raised concern among courts that defendants incompetent to plead guilty, but competent to stand trial, would be excluded from the advantages of plea bargaining, although commentators argue that lenient sentencing of persons with diminished competence could have the same result as a plea. Ellis & Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 464 (1985).

## B.

In my view, both the *Moran* holding and the former minority view miss the mark. I agree with *Sieling* that heightened scrutiny of a guilty plea is necessary when a mentally retarded defendant is before the court, but I disagree that the competence problem is resolved by adopting a higher standard of competence to plead guilty. I also disagree that the problem is resolved by a uniform minimum finding of competence, applicable to all judicial proceedings, to be followed when the waiving of a constitutional right is at issue by an inquiry into the voluntariness of that waiver, outside the arena of competence. I think we have to recognize the special needs of mentally retarded offenders and devise a solution that is relevant both to their disabilities and to the needs of society at large.

Although it is true that a defendant may be incompetent to stand trial because of mental illness, as in *Pate*, or because of mental retardation, as in *Masthers*, the law does not differentiate—as I believe it should—between these forms of mental dis-

ability when dealing with competence.[8]   The mentally ill suffer disturbances in their thought processes and emotions, but the mentally retarded have deficits in their ability to learn. Ellis & Luckasson, *supra*, at 424. Despite this major difference, the legal rules appropriate to determine competence "have become, at best, an afterthought to the fervent battles involving criminal defendants who are mentally ill." *Id.* at 415.

A discussion of common characteristics associated with mental retardation[9]   demonstrates how certain learning deficits substantially affect the criminal legal proceedings in which the retarded find themselves. For example, mentally retarded people have limited communication skills and have difficulty in both expressing thoughts and receiving and understanding them from others. To overcome this deficit, they may engage in "biased responding," that is, answering yes when they think the questioner is looking for a yes. *Id.* at 428. Thus, the form of the questions asked may cause unreliable answers. They may provide responses that appear to be based on their memory of events when, in fact, they have no memory of these events. *Id.* Moreover, they may deny their disability by overrating their own physical or mental skills, or "masking" their handicap by indicating an understanding of events when they have none. *Id.* at 430.

Mentally retarded people also have problems in attention span, focus and selectivity in the attention process. This characteristic may affect trial preparation if a defendant is unable to focus on what counsel consider is a relevant incident; or under questioning, a defendant may appear to be "steering deviously" away from critical events, when it is actually the disability that is preventing defendant from responding appropriately. *Id.* at 429.

---

[8] The Supreme Court recently addressed the differences between mental illness and mental retardation with regard to involuntary commitment procedures in *Heller v. Doe*, — U.S. —, 113 S. Ct. 2637 (1993), but it has not addressed these distinctions with regard to the issue of competence to stand trial or plead guilty.

[9] As Ellis and Luckasson are careful to emphasize, retarded people are individuals and are just as easily regarded in stereotypical terms as persons of a particular race or gender; however, some characteristics occur with such frequency as to warrant certain limited generalizations. Ellis & Luckasson, *supra*, at 427.

Finally, studies on moral development in the mentally retarded indicate that some have "incomplete or immature concepts of blameworthiness and causation." *Id.* They may not be able to distinguish events that are accidents for which they are truly blameless from events they have caused. *Id.* at 429–30. They may even plead guilty to crimes they did not commit because they believe "someone" should be blamed, and they do not understand the concept of causation. *Id.* at 430. Coupled with a desire to please authority figures, such "outer-directed" behavior indicates that some mentally retarded persons will be highly vulnerable to suggestions of authority figures. *Id.* at 432.

Thus, mentally retarded individuals, who may possess some or all of the characteristics outlined above, present unique problems for the judicial system. The critical problem, as demonstrated by this case, is that the inability to understand abstractions and to communicate effectively, with its accompanying compensating behaviors, is so marked in some mentally retarded offenders that it undermines the whole truth-seeking function of the court. Yet, despite our theoretical concern with due process for the mentally retarded, the American judicial system is convicting mentally retarded defendants who are either misdiagnosed or underdiagnosed on a frequent basis as to their degree of mental retardation. Studies consistently show that pretrial diagnosis of mental retardation in defendants is only between two and seven percent, whereas some ten percent of the correctional population actually suffer from mental retardation. Bonnie, *The Competence of Criminal Defendants with Mental Retardation to Participate in Their Own Defense*, 81 J. of Crim. L. & Criminology 419, 419–21 (1990). Clearly, we are doing something wrong.

A reasoned and practical approach to competence decisions is offered by Richard J. Bonnie in the work just cited. Bonnie concludes that the most effective method of protecting the interests of both the mentally retarded offender and the state is to use the current standard of competence to stand trial as a baseline competence standard, but to conduct an individualized and contextualized inquiry into a defendant's competence to make individual decisions or types of decisions. If the competence inquiry is decision specific, it will protect defendants during all phases of the criminal proceeding.

In support of his conclusion, Bonnie argues that the competence construct utilized by courts is based on three important reasons why we view the trial of an incompetent person as inconsistent with due process. He labels these reasons as dignity, reliability and autonomy. The dignity of the state is offended if it subjects to criminal prosecution a person who lacks a meaningful moral understanding of wrongdoing and punishment. We are concerned with reliability of the proceedings because proceeding against a defendant who lacks capacity to recall relevant information and assist an attorney undermines society's interest in the integrity of its criminal process. We are also concerned with autonomy, which is derived from legal rules that establish that certain decisions regarding the defense or disposition of the case are within the prerogative of the defendant. These include decisions regarding the plea, and if the case is to be tried, whether the defendant will be present and will testify. *Id.* at 428.

Aside from the preserving the dignity rationale, which must be present in every competence decision, the other elements of the construct may or may not be relevant, depending on the context. If a defendant is facing a decision at trial that may be made by counsel, then decisional competence is less important than when defendant must make a decision on a plea bargain, even though we may consider decisions at trial to be just as "weighty" as whether to plead guilty. See *Moran*, — U.S. at —, 113 S. Ct. at 2694 (Blackmun, J., dissenting) (whether defendant is competent to stand trial with assistance of counsel is a different question from whether defendant can proceed alone). To stand trial, then, the emphasis is quite properly on the defendant's ability to recall the facts and participate in the defense of the case.

On a guilty plea, however, the entire construct is important. There must be a reliable factual basis for the plea, V.R.Cr.P. 11(f), and to the extent the defendant is found competent to assist counsel at trial with adequate recall of the facts and participate in the defense, this capacity enhances the reliability of a plea. But this level of competence does not tell us anything about the mentally retarded defendant's ability to understand the significance and consequence of pleading guilty. Instead, the competence inquiry on a guilty plea should be directed specifi-

cally at the capacities required to make the decision facing the defendant.

The key question is what level of decisional competence should be required. The "reasoned choice" standard, as had been adopted by the *Sieling* and *Masthers* courts, may be too demanding because it is at odds with a realistic understanding of the attorney-client relationship in criminal defense. This is a relationship in which most clients, retarded or not, rely on the advice of counsel. See *Allard v. Helgemoe*, 572 F.2d 1, 26 (1st Cir.) (failure to understand the intent element of burglary did not render plea unconstitutional where counsel provided defendant with full information prior to plea), *cert. denied*, 439 U.S. 858 (1978). If we accept a realistic theory of autonomy that permits defendants to act upon the advice of counsel, on less than a complete understanding of all of the relevant considerations, in areas where they retain the prerogative to decide, then we should focus less on the "correct" test for decisional competence and more on facilitating an appropriate relationship between attorney and mentally retarded client. Bonnie, *supra*, at 426.

To that end, we should encourage, not bar, the involvement of surrogates such as guardians, protective service workers, family or others who know the defendant's capabilities and who can improve communication and understanding between the defendant and counsel. I, therefore, disagree with the majority's holding, based on *State v. Ladd*, 139 Vt. 642, 644, 433 A.2d 294, 295 (1981), that it would have been a violation of due process in this case to involve defendant's protective services worker in the judicial proceedings, once defendant was found competent to stand trial. With respect to mentally retarded defendants, such due process concerns are, at best, insubstantial and at worst, a charade used to avoid the difficult and sensitive task of devising procedures that realistically address the special needs of this class of defendants. See *Masthers*, 539 F.2d at 727 n.39 (preserving efforts at "normalizing" treatment of retarded requires good offices of nonretarded to safeguard welfare of retarded and improve their understanding of complex constitutional rights).

We should not continue to view the question of competence for the mentally retarded as a black or white issue. Rather, we

should see it, as Dr. Taylor described it, as one that is full of gray. By taking care not to regard a competence decision as one made for all time, courts will be able to make more informed decisions about competence for particular proceedings. The gravity and complexity of the proceedings at issue may then be taken into account in determining whether defendant is competent to participate. In that sense, the standard of competence above the base-line standard can be flexible; different standards of competence may be required depending on the issues and decisions facing the defendant and the degree to which the defendant's understanding may or may not be enhanced by surrogates and counsel. Even with help, some defendants will be excluded from pleading guilty, and the State will be put to its proof. So be it. It is more consistent with due process to have a fair trial precede incarceration than an unknowing plea and violation of probation conditions.

Here, the only competence hearing that was held was directed at defendant's competence to stand trial, and *no* hearing was held prior to the guilty plea and probation warrant that underlies the probation revocation proceedings. Therefore, I cannot accept, as consistent with due process, the majority's holding that the trial court's finding of competence to stand trial is sufficient to support the plea and probation warrant that now forms the basis for the current violations,[10]   and I respectfully dissent.

Defendant's due process rights would not be adequately protected by remanding the case for a psychiatric examination to determine whether he was competent to enter a plea of guilty and comprehend the resulting conditions imposed on him in 1989. Nor would defendant's due process rights be protected by remanding the case for determination of whether defendant "voluntarily and intelligently" waived his constitutional right to trial when he entered the plea, which would be the "second tier" of the *Moran* inquiry, once the first-tier finding of competence

---

[10] Although I do not agree that the two-part inquiry laid out in *Moran* resolves the issue of determining competence to enter a guilty plea, even under the *Moran* test the trial court's finding of competence to stand trial is insufficient to support the acceptance of defendant's plea as the second part of the inquiry, whether there was a "voluntary and intelligent" waiver, was not made.

to stand trial has been made. See *Moran*, — U.S. at —, 113 S. Ct. at 2685–87. He should be released from custody and the State given the option to retry him on the charges underlying the 1989 pleas. See *Drope v. Missouri*, 420 U.S. at 183 (it would be inadequate to attempt to determine defendant's competence at time of trial, but State may retry defendant if he is found competent); *Pate v. Robinson*, 383 U.S. at 386–87 (failure to conduct competence hearing required petitioner's release, but State was free to retry if petitioner found competent).

## III.

I also dissent from the majority's holding that the trial court was not required to hold a new competence hearing prior to the probation revocation hearing. I believe this to have been error for two reasons. The first is that competence should be a context-specific inquiry. See part II, *supra*; see also *Moran*, — U.S. at —, 113 S. Ct. at 2696 (Blackmun, J., dissenting) (defendant's competence to waive counsel and represent himself should have been assessed separately from his competence to stand trial with assistance of counsel). Whereas a mentally retarded defendant may be competent to assist counsel in a simple proceeding, a more complex one may be beyond the same defendant's cognitive abilities. Therefore, even base-line competence to stand trial should be redetermined when the factual context changes. See *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986) (the competence inquiry is limited to defendant's abilities at the time of trial), *cert. denied*, 479 U.S. 1036 (1987).

The second reason is that, under our own statutes, and as a matter of due process, the court was obligated to hold a hearing when it had reason to believe that defendant was not competent to participate in the probation revocation hearing. 13 V.S.A. § 4817(b); *Drope*, 420 U.S. at 178–81; *Pate*, 383 U.S. at 385–86. Even when there is a finding of competence to stand trial, the court must be alert during the trial to changed circumstances that shed doubt on defendant's competence, and that may require a new hearing. See *Drope*, 420 U.S. at 181 (holding that it was a violation of due process not to redetermine the competence of a mentally ill defendant during the course of the trial after he attempted to commit suicide); see also *Moran*, — U.S. at —, 113 S. Ct. at 2696 (Blackmun, J., dissenting) (based upon

defendant's behavior during course of proceedings, and his own testimony regarding four medications he was being administered, "there can be no doubt that the trial judge should have conducted another competency evaluation").

The majority states that no changed circumstances were before the court. The issue, however, is not changed circumstances, but whether the facts in front of the trial court were sufficient under the statute, and the due process clause, to cast doubt on defendant's competence to stand trial. The facts available to the trial judge, who was not the same judge who had held the competence hearing in 1988, were that (a) defendant was mentally retarded; (b) the last competence hearing had been held approximately *two years* earlier on a different matter; (c) the 1988 competence decision, as noted *supra*, can only be characterized as a borderline finding of competence; (d) there was at least one previous, judicial finding of incompetence to stand trial; and (e) most significantly, defense counsel had expressed her inability to work with defendant in formulating a defense because of his cognitive deficiencies. Counsel stated to the court that she had difficulty understanding defendant and making herself understood, and that, on the eve of trial, she had been unable to work with defendant to formulate a rational defense. She had not worked with a mentally retarded defendant before and had no knowledge of how to do so. She was struggling to find an expert in mental retardation who had not been involved with the prior cases, just to bridge the communication gap between her and her client. Under these circumstances, it can hardly be said, as the majority does, that the only evidence supporting a new competence hearing was "[defense counsel's] feeling about it."

The court's response to counsel's statements regarding her difficulties with her client was to continue the hearing, but *after* presentation of the State's case, so that defense counsel could find an expert. The defense ultimately presented was that defendant's mental retardation prevented him from understanding and complying with the conditions. Particularly with reference to "possession" of the gun, the defense contended that defendant might not have understood the meaning of "possess." Defendant found the gun on the premises of where he had been living. It was undisputed that it had been left there by

a friend of defendant's supervisor at least a year before it was discovered. After the gun was found, defendant was confronted about it obliquely by the probation officer, who questioned whether defendant was in violation of his "rules." Defendant denied that he was. At a later time, when asked very directly about the gun, he answered without hesitation that he knew right where it was, and that he would take his probation officer to it. He told her it was not his gun. These seemingly inconsistent responses appeared evasive to his confronters. Because none of the people who worked with defendant had been trained to work with the mentally retarded, they tended to take defendant's responses at face value, and drew inferences of guilt from his actions and responses as they would from a person of average intelligence.

Defendant's expert described defendant's concrete thinking this way: "If you say do you know where the gun is, [defendant] would say yes. He's answering the question. He can't abstract that out to mean yes, I know where the gun is. Do you mean I should take you to it, or do you mean I should bring it to you. He can only answer very concretely that question that's asked." The expert explained that when defendant found the gun, he must have faced a dilemma as to what to do with it, and solved it by hiding it away in a file cabinet, "out of sight, out of mind."

Defendant's expert's testimony was juxtaposed with that of the probation officer. The probation officer was sure defendant understood his conditions because they had been read to him repeatedly and he had been made to recite them. But even if defendant understood them at the time they were communicated to him, the "reading" could not solve the abstract thinking problem presented for defendant when he found the gun on the premises of his residential placement.

The competence problem was not solved by permitting defendant to use his mental retardation as a defense to the charges. Lack of competence is not a defense; it deprives the entire proceeding of due process. As the United States Supreme Court stated in *Drope v. Missouri*:

> The import of our decision in *Pate* v. *Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further

inquiry is required, but that even one of these factors, standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Drope*, 420 U.S. at 180. Further inquiry was compelled by the facts of this case. Failure to conduct an inquiry violated defendant's right to due process. See *id.* at 181.

Finally, defense counsel's failure to request a new competence hearing does not bar relief. The transcript shows that counsel did raise the issue with the court and was so quickly cut off that further requests would have been futile. But even if counsel was required to do more, defendant cannot waive this right. See *Pate*, 383 U.S. at 384 (incompetent defendant cannot knowingly and intelligently waive his right to have the court determine his capacity to stand trial, so that failure to demand sanity hearing did not amount to deliberate waiver.) Competence may be raised and determined at any time when sufficient facts are before the court to compel a hearing, and may even be the subject of a post-conviction collateral attack. See *id.* at 385–86.

## IV.

The relationship between criminal law and the mentally retarded has had a difficult and contentious history. Ellis & Luckasson, *supra*, at 414–21. I would venture to say that few serious observers have been satisfied with the course of the law's development. Despite the growing recognition in the 1960s and 1970s that the mentally retarded were not treated well by the criminal justice system, and some sporadic efforts at reform, the current problem is a lack of attention to the unique needs of mentally retarded defendants. *Id.* This case amply demonstrates, in my view, that legal doctrine is not yet equal to the challenges posed by persons with serious mental disabilities. Perhaps, given the complexities and subtleties involved, and the individual differences of each new case, it will ever be so. I am not content, nonetheless, to take false refuge in excessive liter-

alism, cold logic or a crimped perspective. As judges, we must uphold the law. We must also do justice. I am not persuaded that the decision in this case does either.