No. 71,064

STATE OF KANSAS, *Appellee*, v. JOSEPH D. JOHNSON, *Appellant*.
(899 P.2d 1050)

Opinion filed July 14, 1995.

*Benjamin C. Wood*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*David B. Debenham*, assistant district attorney, argued the cause, and *Joan R. Hamilton*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This first-degree murder case was tried to the court at defendant's request. Joseph D. Johnson was convicted of first-degree murder, K.S.A. 1992 Supp. 21-3401; conspiracy to commit first-degree murder, K.S.A. 21-3302; aggravated burglary, K.S.A. 1992 Supp. 21-3716; contributing to a child's misconduct, K.S.A. 21-3612(e); solicitation, K.S.A. 21-3303; unlawful discharge of a firearm at an occupied dwelling, K.S.A. 1992 Supp. 21-4219(b); and aggravated intimidation of a witness, K.S.A. 21-3833.

The issues are whether: (1) the lesser included offenses of involuntary manslaughter, voluntary manslaughter, and second-degree murder should have been considered; (2) the trial court

applied the wrong standard in evaluating evidence of self-defense; (3) there was sufficient evidence to convict Johnson of first-degree murder, aggravated burglary, and aggravated intimidation of a witness; (4) Johnson was deprived of a fair trial and of his right of confrontation because of his poor hearing; and (5) the trial court erred in admitting Johnson's confession upon finding that Johnson knowingly and voluntarily waived his *Miranda* rights.

Our jurisdiction is under K.S.A. 1994 Supp. 22-3601(b)(1) (a maximum sentence of life imprisonment has been imposed).

We find no error and affirm.

## FACTS

The first link in the chain of events that set the stage for Johnson's convictions began in June 1992 in the home of the Waltons, Robert and Betty (now Betty Parrett). Robert threw a cereal bowl at Betty, striking her in the head. Robert was charged with domestic battery. Betty began living with another man at 518 S.W. Lincoln in Topeka. On August 29, 1992, in what later became a fateful decision, they moved because of fear for their safety. Betty testified in September 1992 against her husband on the domestic battery charge. Robert was convicted. Robert and Betty were divorced in December 1992.

After the cereal bowl incident and before his September trial, Robert contacted Johnson about finding someone to "scare" or "kill" Betty. Johnson said he knew someone who could do it. Johnson approached 19-year-old Alex Walker with a proposal to "do some stuff for some money."

Johnson put Walker in contact with Robert. Robert offered Walker $500 to shoot Betty, or to hurt her "real bad." After several meetings, Walker agreed to do a "drive-by" shooting for $350. Although the deal was for a "drive-by," Robert still wanted Walker to shoot Betty and "kill her, or do what you got to do to do it," and to also shoot Betty's boyfriend if he was "in the way."

After the deal was made, Johnson told Walker he would "have the money" when "the job is done." Apparently some confusion arose about what Walker had agreed to do. Walker believed he was only supposed to "shoot the house up" for $350. Walker said John-

son instructed him to wait until 2:00 or 3:00 a.m. to do the shooting, and to do it "fast."

On August 21, 1992, Walker and two teenage companions drove by 518 S.W. Lincoln and fired three shots at the house with a handgun; one shot entered the house through the front door, two others through a front window. No one was injured. Immediately after the shooting, Walker and the teenagers found Johnson in his car. Johnson paid them the $350.

The next day, Johnson reported to Robert that the drive-by was done and that the boys had been paid. Robert was upset because Betty was not shot. Robert wanted either Betty shot or his money back. Johnson said he could find someone to do it.

Several days later, Robert told Johnson he would pay $1,000 to have Betty killed. Johnson said he could find a teenager who would do it. Johnson approached 16-year-old Dominic Love, telling him a man was willing to pay to have his ex-wife or his ex-wife's boyfriend "or whoever was in the house killed." Love was told he would be paid "a thousand or 600, something like that." Love agreed to do it.

Johnson brought Love to a Kwik Shop on August 30, 1992, where Robert was waiting. Robert gave Johnson approximately $1,000. Johnson said he would let Love use his .38 revolver. Johnson and Love drove together to 518 S.W. Lincoln, where they believed they would find Betty and her boyfriend. They were unaware that the day before, Betty and her boyfriend had moved out. Mr. Chang Nam Kim initiated his brief, doomed tenancy by moving into 518 S.W. Lincoln on Sunday morning, August 30.

Johnson dropped Love around the corner from the house. Love's instructions, provided by Johnson, were to "shoot anybody who was in the house." Love was told that Betty was a "chubby, fat white woman," and the boyfriend was a "chubby, fat . . . white dude."

Love knocked on the front door, and Mr. Kim answered. Love told Mr. Kim to "back up." When Mr. Kim pointed at Love's gun, Love shot him one time in the head, killing him. Love entered the house "to see if anyone else was in there." He checked only the living room before running out because he was "scared."

Love's testimony explaining the shooting of Mr. Kim was equivocal. He first stated, "I thought that he was going to grab the gun, but he wasn't doing nothing but pointing at the gun, so I shot him." When asked why he shot Mr. Kim, Love stated, "Because he was in the house. I was told to shoot anybody who was in the house." On cross-examination, in response to a series of leading questions from defense counsel, Love answered, "Yeah" to the question, "You thought [Mr. Kim] was going to grab the gun, . . . [a]nd so, you acted in self-defense and shot him, correct?" On redirect, the prosecutor challenged Love on whether he truly shot Mr. Kim in self-defense, and Love responded, "I never said it was self-defense." Love later testified that when Mr. Kim answered the door, he thought Mr. Kim was "just one of the people in the house that's supposed to be shot."

After the shooting, Love met Johnson around the corner. Johnson asked if Love did it, and Love replied, "I got somebody." Johnson paid Love $300.

The following morning, police arrested Johnson at his home and took him to the station for questioning. Officer Sams testified that he read Johnson his *Miranda* rights and that Johnson waived those rights. Johnson spoke with police for approximately an hour and a half regarding his involvement in the drive-by shooting and homicide. The interview was videotaped, but the videotape is not included in the record on appeal.

Johnson, who is 74 years old, apparently has some difficulty hearing. Before trial, he filed a motion to suppress his statement. He contended his impairment prevented him from hearing and understanding the *Miranda* warning, thus preventing him from knowingly and voluntarily waiving his Fifth Amendment rights. The trial court, in denying the motion to suppress, viewed the videotape and heard testimony of Officer Sams and an audiologist who performed hearing tests on Johnson.

## DISCUSSION

### Contributing to a Child's Misconduct

Initially, we observe that Johnson asserts that the State failed to prove that Love was a "child" within the definition of the crime of

contributing to a child's misconduct or deprivation, K.S.A. 21-3612(e): "causing or encouraging a *child under 18 years* of age to commit an act which, if committed by an adult, would be a felony." (Emphasis added.) Love was 16 when he committed the offenses in question. However, Johnson asserts that Love was certified as an adult in Love's criminal prosecution. Thus, Johnson claims that Love was not a "child" and that his conviction under K.S.A. 21-3612 therefore must be set aside. Johnson failed to raise this defense at trial and therefore waives it. See *State v. Johnson*, 253 Kan. 75, 91, 853 P.2d 34 (1993).

## Lesser Included Offenses

Johnson next contends that the trial court erred by failing to consider the lesser included offenses of involuntary manslaughter, voluntary manslaughter, and second-degree murder. He cites K.S.A. 21-3107(3), which provides that a trial court has an affirmative duty to instruct a *jury* as to all lesser included offenses for which there is evidence to support a conviction on the included offense. We are reviewing alleged errors from a bench trial. Jury instructions are not at issue.

The trial court is presumed to know the law. *Chance v. State*, 195 Kan. 711, 715, 408 P.2d 677 (1965). Even if the evidence had supported instructions on lesser included offenses in a jury trial, the trial court is presumed to have followed such instructions in a bench trial. See *Com. v. Gonzales*, 415 Pa. Super. 564, 570, 609 A.2d 1368 (1992) (noting that the court in a bench trial is presumed to follow the instructions it would otherwise give to a jury).

The trial court, in the case at bar, found beyond a reasonable doubt that Johnson was guilty of first-degree murder. Consequently, it was not necessary for the trial court to consider any lesser included forms of homicide. See PIK Crim. 3d 56.01, 68.09; see also *State v. Makin*, 223 Kan. 743, 748, 576 P.2d 666 (1978) (reviewing a bench trial conviction of involuntary manslaughter, the Supreme Court found that although vehicular homicide was a lesser included offense under the circumstances and the trial court would have had a duty to instruct the jury on that offense, the

evidence was sufficient to support conviction of the greater offense).

The record contains ample evidence supporting the conclusion that a rational factfinder could have found Johnson guilty of first-degree murder beyond a reasonable doubt. See *State v. Grissom*, 251 Kan. 851, Syl. ¶ 4, 840 P.2d 1142 (1992).

## Trial Court's Finding on Self-Defense

Johnson reasons that the trial court applied the wrong standard to evaluate his affirmative defense that Love shot Mr. Kim in self-defense. In explaining its finding, the trial court first stated:

"The Court disagrees with defendant's interpretation of the facts and the inferences taken therefrom . . . which infer that the shooter, Love, acted in self-defense. In this case, the evidence was weak and uncorroborated and the Court could not find beyond a reasonable doubt that there was . . . any legitimate self-defense theory."

At that point, the prosecutor interrupted the trial court, stating, "[W]hen you said that . . . the evidence did not prove beyond a reasonable doubt the self-defense was proven, I don't think that's the standard." The trial judge then acknowledged that he "may have misspoke" and said, "Basically I don't feel that the evidence would support . . . self-defense."

Johnson notes that the correct standard for reviewing a claim of self-defense is whether the asserted defense causes the trier of fact to have a reasonable doubt about the defendant's guilt, not whether the defendant has proven self-defense beyond a reasonable doubt. See PIK Crim. 3d 52.08. Although the trial court's first statement suggests that it applied the wrong standard, it acknowledged that it misspoke and emphasized the weakness of the evidence supporting Johnson's claim that Love fired in self-defense. We conclude that the trial court applied the correct standard but simply misspoke in explaining its ruling.

## Sufficiency of the Evidence: Aggravated Intimidation

Johnson next contends that there was insufficient evidence to support his conviction for aggravated intimidation of a witness or victim. Our standard of review requires us to consider only

whether, after reviewing all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found Johnson guilty beyond a reasonable doubt. See *Grissom*, 251 Kan. 851, Syl. ¶ 4.

Intimidation of a witness or victim, as defined in K.S.A. 21-3832, includes "knowingly and maliciously preventing or dissuading, or attempting to prevent or dissuade: (a) Any witness or victim from attending or giving testimony at any civil or criminal trial." Aggravated intimidation, as defined in K.S.A. 21-3833, includes intimidation of a witness or victim when: "(a) The act is accompanied by an express or implied threat of force or violence against a witness, victim or other person or the property of a witness, victim or other person."

An essential element of aggravated intimidation of a witness or victim is that it be done "knowingly and maliciously." Johnson contends "there is no evidence that the drive-by shooting was intended to prevent Betty from testifying at a proceeding." He is only partly correct. There is no clear, direct evidence that Robert's purpose in having Johnson arrange a drive-by shooting was to prevent or discourage Betty from testifying against him. Specific intent may be shown, however, by "acts, circumstances and inferences reasonably deducible therefrom and need not be established by direct proof." *State v. Pratt*, 255 Kan. 767, 769, 876 P.2d 1390 (1994).

The record reveals that charges were filed against Robert for domestic battery on June 16, 1992. Betty was the victim. Robert's trial was held on September 21, 1992. As the victim and only witness to the crime besides Robert, Betty could have been expected to, and did, testify at that trial. Meanwhile, between June 16 and September 21, 1992, Robert requested and Johnson helped in arranging both a drive-by shooting of Betty's house and her attempted murder. The timing of Robert's attempts to harm Betty suggest a connection with the criminal charges pending against him.

Johnson contends, however, that such timing is not enough for a rational factfinder to infer beyond a reasonable doubt that Robert intended to prevent Betty from testifying. Johnson reasons that Ralph Walton, Robert's son, testified that his father wanted to kill

his mother because "she left him and he didn't like it." However, Ralph also testified that his father told Johnson during their first meeting that he "wanted somebody to go by and scare my mom and see if they can kill her."

When considering sufficiency of the evidence claims, we view the facts in the light most favorable to the prosecution. *Grissom*, 251 Kan. 851, Syl. ¶ 4. After charges were filed and before trial, Robert made two attempts to hire someone through Johnson to harm Betty. From the facts, a rational factfinder could find Johnson guilty as an aider and abettor to the crime of aggravated intimidation of a witness or victim. Johnson does not challenge the sufficiency of the evidence of his aiding and abetting activities.

## Effect of Johnson's Hearing Impairment

Johnson next contends that he was unable to hear parts of his trial and sentencing because of his hearing impairment. He contends that the trial court failed to take adequate measures to ensure that he could hear during all critical stages of his case. Johnson asserts that he was deprived of a fair trial, due process, and his Sixth Amendment right to confrontation.

The Sixth Amendment, applicable to the states through the Fourteenth Amendment, guarantees a defendant the right of confrontation and the right to be present at all stages of a prosecution. *State v. Cromwell*, 253 Kan. 495, Syl. ¶ 7, 856 P.2d 1299 (1993). The Due Process Clause of the Fourteenth Amendment protects the defendant's right to a fair trial. *State v. Boone*, 218 Kan. 482, Syl. ¶ 2, 543 P.2d 945 (1975), *cert. denied* 425 U.S. 915 (1976). Johnson cites two cases, *State v. Staples*, 121 N.H. 959, 437 A.2d 266 (1981), and *People v. Rivera*, 125 Misc. 2d 516, 480 N.Y.S.2d 426 (1984), which have recognized that a defendant's inability to hear during certain stages of the prosecution, if not recognized and remedied through some special procedure, may violate the defendant's rights under the Sixth and Fourteenth Amendments.

Johnson argues that a video monitor for the hearing impaired should have been used to help him. The choice of procedure to help a hearing-impaired defendant rests in the sound discretion of the trial court. The ultimate consideration is whether the defen-

dant's constitutional rights to confrontation, to be present, and to a fair trial were preserved. See *State v. Schaim*, 65 Ohio St. 3d 51, 64, 600 N.E.2d 661 (1992).

Johnson is not deaf. He wears a hearing aid in one ear. Defense counsel informed the trial court of Johnson's hearing impairment before trial. A motion for funds to pay for a hearing test to determine the extent of Johnson's disability was granted. Dr. Manford Barber performed hearing tests on Johnson on April 30, 1993, nearly eight months after his arrest and his confession to the police, and approximately six weeks before trial.

Johnson raised the issue of his hearing impairment in a pretrial motion to suppress his confession on the basis that he did not hear or understand his *Miranda* warnings. Officer Sams testified at the hearing, and the court viewed the videotape of the confession. According to Officer Sams, only once during the approximately 90-minute interview did Johnson ask for a question to be repeated. Johnson was responsive to questions throughout the interview, suggesting that he heard or understood the questions asked. Dr. Barber testified that Johnson suffered some hearing loss in both ears, but with his hearing aid in his right ear, he could hear words at as low as 25 decibels, roughly equivalent to a whisper at a couple of feet. Officer Sams testified that Johnson was wearing a hearing aid when interrogated. The district court denied Johnson's motion to suppress, explaining that "the defendant appeared fully capable of understanding and hearing the questions that were addressed to him."

Beginning with the hearing on the motion to suppress and continuing through trial and post-trial proceedings, the trial court adopted a special procedure to ensure that Johnson would not be prejudiced because of his hearing impairment. Johnson was instructed repeatedly and meticulously to raise his hand if at any point he could not hear or understand any statement made by a judge, witness, or attorney. Until Johnson's sentencing hearing, there were no significant interruptions in the proceedings due to Johnson's hearing impairment. At one point, defense counsel decided to move the defense table and chairs closer to the witness

stand. Another time, a post-trial hearing was momentarily interrupted while Johnson changed the battery in his hearing aid.

Through trial and two hearings on post-trial motions, neither Johnson nor his counsel alleged that his hearing impairment was causing him prejudice. Johnson was able to communicate effectively with his counsel and with the trial court when such communications took place on the record. On the night before the sentencing hearing, Johnson allegedly fell in the jail, which further impaired his hearing. When he appeared for sentencing, he would not respond to questions unless they were written down on a piece of paper. The trial court was unsure whether Johnson was "unable or unwilling" to respond; consequently, the hearing was adjourned to set up a video monitor for the hearing impaired. Johnson had difficulty understanding how to use the video equipment. The trial court again adjourned and rescheduled the sentencing hearing.

When Johnson's sentencing hearing resumed in November 1993, oral communications with him were difficult, but not impossible. Johnson wore his hearing aid. The courtroom was arranged with special consideration to accommodate Johnson's hearing impairment. The judge sat in the witness box, and Johnson and his counsel sat at a table which had been moved next to the witness box. Johnson was approximately six to eight feet from the trial judge. The trial court had also prepared a written sentencing worksheet, a copy of which was provided to Johnson so he could see in writing the sentence being imposed against him.

The record reflects that the trial court used special procedures throughout the proceedings to accommodate Johnson's hearing impairment. Johnson alleges no specific prejudice as a result of these special procedures; he makes only general allegations that he was not "effectively present." The trial court did not abuse its discretion. Johnson's constitutional rights were not violated.

## Denial of Motion to Suppress the Confession

Johnson argues that the trial court erred in denying his motion to suppress his "confession" and in admitting such statements at trial. He did not renew his objection at trial when his statements were introduced through the testimony of Officer Sams. Because

Johnson failed to renew his objection at trial, this issue is not preserved for appeal. See *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993).

We observe, in any event, that the district court conducted a full evidentiary hearing on the motion and concluded that Johnson's statement was freely and voluntarily given and that Johnson was able to hear and understand his *Miranda* warnings and the questions posed to him by the officers. The record supports the trial court's finding.

### Sufficiency of the Evidence: First-Degree Murder and Aggravated Burglary

Johnson contends that the State failed to introduce sufficient evidence to convict him of first-degree murder and aggravated burglary. We have held the evidence of first-degree murder to be sufficient. As for aggravated burglary, Johnson argues that "the entry of the house [by Love] did not occur until after the shooting. Aggravated burglary requires entry into a dwelling . . . with the intent to commit a felony." See K.S.A. 1992 Supp. 21-3716.

A rational trier of fact could find beyond a reasonable doubt that Love entered 518 Lincoln with the intent to commit a felony, *i.e.*, kill whoever else was there. Johnson does not contend that he did not aid and abet Love, and the record clearly supports the conclusion that he did. Thus, Johnson's arguments concerning sufficiency of the evidence are not persuasive.

Affirmed.