769 A.2d 656 (2001)
In re J.M., Juvenile.
No. 99-368.
Supreme Court of Vermont.
February 9, 2001.
*657 Kyle C. Sipples, Caledonia County Deputy State's Attorney, St. Johnsbury, for Plaintiff-Appellee.
Robert Appel, Defender General, and Anna Saxman, Appellate Attorney, Montpelier, for Defendant-Appellant.
Present: AMESTOY, C.J., DOOLEY, MORSE, JOHNSON and SKOGLUND, JJ.
DOOLEY, J.
J.M., a fourteen-year-old mentally retarded juvenile, appeals from a competency finding and conditional plea entered in the Caledonia Family Court. J.M. raises two issues on appeal. First, he claims that the court erred, in violation of V.R.Cr.P. 11 and his constitutional right to due process of law, in accepting a plea without determining whether he understood the nature of the charge, the penalties, and the rights he was waiving; whether the admission was knowing and voluntary; and whether there was an underlying factual basis for the plea. The State concedes that the court failed to comply with Rule 11. Second, he contends that the court erred in finding him competent to stand trial, and *658 that its findings do not support the competency decision. We agree that the family court did not satisfy its obligations under Rule 11, and we reverse the judgment of guilt. We also agree with J.M. that the family court's findings on the issue of competency were inadequate. We remand for a new competency determination, and if J.M. is found competent, for a new plea and further proceedings consistent with that plea.
The Caledonia County State's Attorney filed four petitions against J.M. accusing him of simple assault in violation of 13 V.S.A. § 1023(a)(1), unlawful mischief in violation of 13 V.S.A. § 3701(c), disorderly conduct in violation of 13 V.S.A. § 1026, and lewd and lascivious conduct with a child in violation of 13 V.S.A. § 2602. The family court held a competency hearing over three days and found J.M. competent to face a delinquency proceeding. J.M. then entered into a conditional plea agreement, pursuant to which he admitted the allegations of simple assault, and the State dismissed the other charges. J.M. was placed on juvenile probation. This appeal followed.
We start with the issue of Rule 11 compliance. Following the court's determination that J.M. was competent to face a delinquency charge, the parties submitted an agreement to the court whereby J.M. would enter a conditional plea to the charge of simple assault and be placed on probation, and the State would dismiss the other charges against him. The agreement also reserved to J.M. the right to appeal the competency ruling. The court approved this agreement. It failed, however, to engage in any Rule 11 colloquy, and J.M. made no admission on the record.
The Family Court Rules provide that V.R.Cr.P. 11 applies in juvenile delinquency proceedings. V.R.F.P. 1(a)(1) (Rules of Criminal Procedure apply to all delinquency proceedings except as provided by this rule.); V.R.F.P. 1(a)(3) (Rule 11 applies, but is modified so that admissions and denials replace pleas of guilty and not guilty). Indeed, V.R.F.P. 6(d)(3) provides specifically that the court may not accept a juvenile's waiver of constitutional rights or admission unless it determines, among other things, that there is a factual and legal basis for the waiver or admission, that the attorney has investigated the relevant facts and law and consulted with the juvenile, and that the juvenile has entered into the waiver or admission knowingly and voluntarily. While V.R.F.P. 6(d)(4) sets forth circumstances in which a waiver or admission may be approved if the juvenile is unable, because of mental or emotional disability, to understand the nature and consequences of the waiver or admission, or is unable to communicate with respect thereto, the rule expressly exempts cases in which it is alleged that a person has committed a crime or juvenile act. In such cases, regardless of disability, "that person's knowing and voluntary consent shall be required with respect to the waiver or admission." Id.
In this case, the record reveals that the court failed to conduct any V.R.Cr.P. 11 colloquy whatsoever. The court failed to address J.M. and determine whether J.M. understood the charges for which the plea was offered, the penalties provided by law, the fact that he was waiving important constitutional rights, and whether the admission was knowing and voluntary. The brief exchange that took place was between the court and the attorneys, and this exchange was more to ensure that the paperwork was filled out properly than to fulfill the requirements of Rule 11. It is not even clear from the record whether J.M. was present in the courtroom for this exchange.
*659 Thus, as the State conceded on appeal, the court committed plain error in failing to conduct a Rule 11 colloquy with the minor. See State v. Thompson, 167 Vt. 383, 387, 708 A.2d 192, 194 (1998). As a result, we must vacate J.M.'s admission.
The second issue involves whether J.M. was competent to face the delinquency adjudication. We start with a more detailed description of the proceedings in the family court. During the first day of the competency hearing on February 18, 1999, the court heard the testimony of three witnesses called by J.M. These witnesses included a psychologist who had been under contract with J.M.'s school system for nearly twenty years, an instructional specialist employed by J.M.'s school system, and a school counselor who worked with J.M. The psychologist submitted a report in which he stated that J.M. had an IQ score of 65 in 1994 and 84 in 1991. On another intelligence test, the Woodcock Johnson knowledge subtest, J.M. had scores of 84 in 1993 and 83 in 1994.
According to the psychologist's report, J.M.'s scores placed him in the "below-average and above the learning impaired range." This is consistent with the American Psychiatric Association definition of mental retardation: "Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test," plus impairments in adaptive functioning such as communication, social/interpersonal skills, functional academic skills, self-care skills, self-direction, work or safety. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 46 (4th ed.1994). Adaptive functioning "refers to how effectively individuals cope with life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Id. at 40. The psychologist's report also stated that J.M.'s academic skills were "extremely delayed," and his scores in reading, math, writing, and knowledge represented "an almost total lack of skill and even familiarity with the most basic facts of the written language." The psychologist interpreted these test results and concluded that J.M. had not fully used his potential to learn in school, and that he "rejects learning anything to do with books and writing." The psychologist noted that J.M., although "seriously delayed," had "much more ability than he has applied to learning at school."
During the competency hearing, the psychologist testified that the purpose of his report was to assess J.M.'s eligibility for special education. He testified that typically J.M. would seek to avoid conflict and would follow another's lead rather than use independent judgment, and that he would be suggestible on the witness stand. In response to questions posed by the court, the psychologist testified that J.M's cognitive ability was not congenital, and he drew a distinction between what he termed as someone who was "trainable" versus someone who was "educable." According to his testimony, a "trainable retarded person" is someone who would not be expected "to ever learn to read and would need supervision on the job." The psychologist classified J.M. as "above that" because he was "educable," meaning that he "would need special training," but would "be able to earn a living" and hold down a job.
J.M.'s instructional specialist testified that she had two years experience providing services for 504 students, and that she had been working with J.M. since September of 1999. She categorized his ability to comprehend, reason, and solve problems on an abstract conceptual level, as being *660 that of a third or fourth grader. She also opined that J.M. would probably not be capable of appraising the likely outcomes of a trial, and that under the stress of a trial, J.M. might begin to cry or simply put his head down. Nevertheless, she did concede that it was possible for J.M. to participate in and understand the court process if the proceedings were adequately explained.
J.M.'s school counselor testified that J.M.'s ability to think abstractly and problem solve would be minimal, but she also admitted that hers was not "a professional opinion." In appraising J.M.'s ability to understand the charges against him and assist counsel, she also stated that J.M. had talked to her about the charges against him, and that J.M. had told her that "he knew that he didn't do it because his mother told him" he didn't do it.
In assessing J.M.'s competence, the court appointed Dr. Robert Linder, a forensic psychiatrist, who evaluated J.M. specifically for competence to stand trial. Dr. Linder had performed over 2000 competency evaluations on adults, but had limited experience with mentally retarded juveniles. Dr. Linder performed a two-hour competency evaluation of J.M. He also reviewed the juvenile petitions, affidavits, and the psychologist's report. According to Dr. Linder's report, J.M.'s intelligence test scores were "below average but above the impaired range although he demonstrated extreme delay academically." Dr. Linder's "diagnostic impression" of J.M. was "Mild Mental Retardation or Borderline Intellectual Functioning."
Dr. Linder's report stated that during the interview with J.M.:
He spoke clearly and coherently. . . . His thoughts were logical, tight and goal oriented. He was not loose or tangential in his associations.
He was oriented to person, place and time. Attention was maintained even with his restlessness. Concentration was good. Memory was adequate. . . . His vocabulary was limited. He did not understand the word "optimistic." . . . He was aware of issues within areas of interest but could not report who the president was.
Dr. Linder reported that J.M. had an understanding of the charges against him, understood the conditions of his release and some of the reasoning behind them, knew who his attorney was and that she was on his side, knew that the judge would decide if he was guilty or not, and that it was possible that he might be incarcerated. In addition, J.M. had a rudimentary understanding of the plea bargaining process, and Dr. Linder indicated that J.M. had been able to relate his version of events that led to the charges against him. Dr. Linder's report stated: "An opinion that J.M. is marginally mentally competent to stand trial for the alleged offenses would find support," but that a special effort would be necessary to ensure that J.M. could understand the trial process and assist counsel. He noted J.M.'s difficulties in learning and retaining what he had learned, but asserted that J.M. "would be able to relate appropriate information to his attorney in the preparation of his defense."
In addition to filing his report, Dr. Linder also testified at the competency hearing on July 15 and August 6, 1999. Dr. Linder noted that, in general, children are "often quite unfamiliar with the courtroom setting," and "have no prior experience in the court, so their knowledge base ... is quite limited." He testified that J.M. had "no problem" relating his version of the events that gave rise to the various charges. Dr. Linder described J.M. as "fortunate" in that he had no "major mental illness," and he had no distortions in his *661 thinking or delusional thoughts. Dr. Linder also testified that J.M. was better able to relate to the legal issues than one would expect from someone with an IQ in the mid-sixties.
Also at the hearing on July 15, Dr. Linder explained his use of the term "marginally competent." He stated that J.M. was "a person who has special needs, that he needs education on issues, and providing that education is going to have to take a special path because of the way he learns." He also noted that it was possible for an attorney to overcome J.M.'s limitations, and that an attorney "might benefit from the assistance of somebody who is experienced in communicating and teaching someone with [J.M.'s] deficits." This "cognitive facilitator" or "cognitive interpreter" could be used to facilitate someone with J.M.'s intellectual limitations in going through the legal system.
Dr. Linder also testified regarding J.M.'s competence to enter into a plea agreement. He observed, with regard to plea bargaining, that J.M. understood "some of the idea of the give and take of that process and how he might benefit from it." Dr. Linder explained that even though plea bargaining was relatively abstract, if there was a requirement of abstract thought put in place for competency evaluations, that 80% of the people he evaluated would be incompetent because "even people of average I.Q." often have "very limited abstract capacities."
On the third and final day of the competency hearing, August 6, 1999, the court rendered its decision. The court acknowledged that the witnesses called by J.M. were people who had dealt with him on "virtually a daily basis." The court pointed out that these witnesses were familiar with J.M. in the education context, but that the issue was determining J.M.'s competency in the "legal sense" and not the "academic sense." The court stated that, despite J.M.'s difficulties in school, he did recall the offenses with which he was charged, and the court pointed out the difference between learning and remembering what one has been taught at school and one's ability to recall "important life events." The court also stated that Dr. Linder was an experienced forensic psychiatrist, that his job routinely included assessments of competency, and that he was more "neutral" because he came to the case without any prior association with J.M. The court then stated:
Intellectual deficits and serious learning difficulties are very sympathetic, but they do not equal competence to stand trial in a strictly legal sense. An abstract thought is not a precondition to a finding of competence although the importance of it has certainly been stressed here.
Taking into account all of the evidence, Dr. Linder's report, and weighing and balancing the credibility of the respective witnesses by all of the standard indicia of credibility, I find that  notwithstanding the vigorous cross-examination of him and his opinions  that Dr. Linder's opinion should be believed and that the Court will make a finding of competence at this time. . . .
This was the sum total of the court's findings on the issue of competency.
In Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the United States Supreme Court set out the standard for competency to stand trial for adults. The Dusky standard requires that a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and have "a rational as well as factual understanding of the proceedings against him." Id.; see also State v. Lockwood, 160 Vt. 547, 554, 632 A.2d 655, 660 (1993). The *662 standard of competence to plead guilty is the same as the standard of competence to stand trial. Godinez v. Moran, 509 U.S. 389, 396-99, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); Lockwood, 160 Vt. at 554, 632 A.2d at 660. As we have noted elsewhere, evidence of mental retardation does not, by itself, necessarily require a finding of incompetence. State v. Cleary, 161 Vt. 403, 406, 641 A.2d 102, 105 (1994).
Juveniles facing delinquency charges are entitled to the same essential and fundamental due process rights as adult criminal defendants. In re R.B., 134 Vt. 368, 369, 360 A.2d 77, 78 (1976) (citing In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). Although juveniles are not necessarily entitled to every procedural protection afforded criminal defendants, see McKeiver v. Pennsylvania, 403 U.S. 528, 545, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (no due process right to trial by jury for juvenile), an incompetent juvenile cannot be found delinquent without violating our basic concepts of due process of law. See Golden v. State, 341 Ark. 656, 21 S.W.3d 801, 803 (2000) (denial of juvenile competency hearing a violation of due process of law); In re W.A.F., 573 A.2d 1264, 1264-65 (D.C.1990) (Dusky applies to juvenile delinquency defendant); In re Carey, 241 Mich.App. 222, 615 N.W.2d 742, 746-47 (2000) (right not to be tried while incompetent as fundamental in juvenile cases as it is in criminal proceedings for adults); In re Williams, 116 Ohio App.3d 237, 687 N.E.2d 507, 510-11 (1997) (same). We note, however, that it is likely that many juveniles, often because of limited life experience, may not have the same level of understanding of criminal proceedings as an adult. Thus, in juvenile competency hearings, evaluations of a particular juvenile's competency are to be made with regard to juvenile norms. In re Carey, 615 N.W.2d at 748.
We recognize, of course, that it is often difficult for a court to accurately assess an adult defendant's capacity to understand his or her rights and to comprehend how to proceed when charged with a crime. It is even more difficult when the court is asked to determine if a child defendant is competent to stand trial, and when the circumstances include a diagnosis of mental retardation, the task is daunting. The very complexity of the situation demands a careful assessment of the multiple factors relevant to the issue of competency and specific findings regarding those factors. We have held that when reviewing a trial court's competency determination, we will uphold the court's findings if supported by credible evidence and not clearly erroneous. State v. Thompson, 162 Vt. 532, 535, 650 A.2d 139, 141 (1994). We can uphold findings, however, only if they are adequate both to justify the court's conclusions and allow for meaningful appellate review.
In this case, the evidence was sufficient to find J.M. competent. Dr. Linder's opinion, based on his examination of J.M. and his consideration of J.M.'s history, provided an adequate basis for the court's conclusion. See State v. Bean, 171 Vt. ___, ___, 762 A.2d 1259, 1263 (2000); State v. Thompson, 162 Vt. at 534-35, 650 A.2d at 140-41. Although the evidence was sufficient to support the court's conclusion, we cannot say the same about the findings. They failed adequately to address the extensive evidence about J.M.'s cognitive maturity, abstract reasoning ability, language and memory skills, and reactions to stress as they related specifically to the competency standards. They did not attempt to reconcile the conflicting evidence about J.M.'s capabilities. Indeed, the only real finding is that "Dr. Linder's *663 opinion should be believed." We do not believe this conclusory statement is adequate to explain how the court weighed the evidence and reached the conclusion it did. See In re M.B., 147 Vt. 41, 45, 509 A.2d 1014, 1017 (1986) ("It is crucial that findings indicate to the parties and to this Court, if an appeal is taken, what was decided and how the decision was reached."); In re R.H., 138 Vt. 425, 426, 415 A.2d 1318, 1319-20 (1980) (this Court will not accept conclusory findings which merely echo a legal standard); People v. Zapotocky, 869 P.2d 1234, 1245 (Colo.1994) ("competency to stand trial is a matter for judicial determination; it is not a finding made on the basis of rubber-stamping the report of a psychiatrist"). As a result, we conclude that the court failed to make sufficient factual findings to justify its determination that J.M. was competent.
We also conclude that the court's competency determination was inadequate because it did not respond to the conditions in Dr. Linder's opinion. Dr. Linder testified that J.M. would require special instruction or help in understanding the court process before he could meet the competency standard. A competency determination can require special help or services to enable the defendant to meet the constitutional competency standard. See, e.g., United States ex rel. Negron v. New York, 434 F.2d 386, 389-90 (2d Cir. 1970) (provision of interpreter can cure constitutional infirmities otherwise present where Spanish-speaking defendant not sufficiently proficient in English to effectuate constitutional rights to consult with counsel, cross-examine witnesses, and have meaningful presence at own trial); State v. Kounelis, 258 N.J.Super. 420, 609 A.2d 1310, 1313-14 (App.Div.1992) (same); State v. Johnson, 258 Kan. 61, 899 P.2d 1050, 1056-57 (1995) (providing hearing aid to accommodate hard of hearing criminal defendant); United States v. Brandon, 158 F.3d 947, 953-56 (6th Cir.1998) (forcibly medicating criminal defendant to achieve competence to stand trial permissible under proper procedures); People v. Sakarias, 22 Cal.4th 596, 94 Cal.Rptr.2d 17, 995 P.2d 152, 162-64 (2000) (criminal defendant once ruled incompetent to stand trial subsequently held to be competent after undergoing treatment that included anti-psychotic and anti-depression medication); Turner v. Commonwealth, 860 S.W.2d 772, 774 (Ky.1993) (same).
In People v. Johnny P., 112 Misc.2d 647, 445 N.Y.S.2d 1007 (Crim.Ct.1981), the court faced a situation similar to that before us in order to ensure that a young, mentally ill defendant was capable of waiving fundamental rights and pleading to criminal charges. There, the court appointed a psychiatric specialist to assist the criminal defendant to understand the court process, communicate with the court, and enter his plea.[*] The court stated that the power to appoint an interpreter was "not limited to instances in which the failure of communication exists because of a language barrier, but extends as well to instances involving other disabilities," and that "although defendant does not require linguistic interpretive services, his thought processes are so convoluted that only one who has both medical and forensic familiarity with them can properly communicate with defendant." Id. 445 N.Y.S.2d at 1010.
The court relied entirely on the opinion of Dr. Linder, rejecting contrary opinions. *664 Dr. Linder found J.M. marginally competent and stressed that he would need additional assistance to have a rational understanding of the proceedings and consult with his attorney. It may be that assigned counsel has the special skills to relate effectively to this mentally retarded juvenile and to explain the proceedings sufficiently that J.M. can participate in his defense. It may be that another professional is needed. In these circumstances, we believe the court must ensure that J.M. meets the threshold standard of competency by whatever means are appropriate. The court failed to address this need.
Finally, we note that the statutory procedures governing a determination of whether a defendant is competent to stand trial apply only in criminal cases, see 13 V.S.A. §§ 4814-4823, and we have adopted no rules to establish procedures for such a determination in juvenile cases. In this case, the family court generally followed the statutory procedure, and J.M. has not claimed any procedural error. We can foresee, however, that procedural issues will develop in other cases. We therefore request that our Advisory Committee on the Rules for Family Proceedings propose amendments to the family rules to govern determinations of competency in juvenile proceedings.
Reversed and remanded for proceedings consistent with this opinion.
SKOGLUND, J., dissenting.
I agree with the Court's ruling that the trial court erroneously failed to comply with V.R.Cr.P. 11. I also concur in its conclusion that the trial court's findings on the issue of competency were inadequate. I do not agree, however, with its holding that the record supported the trial court's finding of competency. Although the State's psychiatric expert opined that J.M. was "marginally mentally competent," that opinion was virtually eviscerated by the expert's own admissions at trial, and the overwhelming evidence submitted by the defense concerning J.M.'s severe cognitive limitations. Without substantial credible evidence to support it, an expert's bare "opinion" is worthless. I would thus hold that the court's finding of competence was clearly erroneous, and reverse the judgment in its entirety.
This case turns on the sufficiency of the record evidence of J.M.'s competence to stand trial. Accordingly, although the facts are adequately described in the Court's opinion, certain evidence warrants additional scrutiny. As the Court notes, the evidence of J.M.'s mental retardation and cognitive deficits was not substantially in dispute. The trial court heard testimony from a school psychologist, instructional specialist, and school counselor, as well as a court appointed psychiatrist who evaluated J.M. specifically for competence to stand trial. The school psychologist, who had twice evaluated J.M., testified that his full scale IQ was 65, which placed him in the category of mentally retarded. According to the psychologist's report, J.M.'s academic ability was far below the sixth grade level. Indeed, his performance revealed "only beginning first grade level reading and writing skill." J.M.'s academic scores represented "an almost total lack of skill and even familiarity with the most basic facts of the written language." When asked at trial if J.M. would be able realistically to appraise the likely outcomes of the trial, the psychologist replied, "I think his chances are zero." The psychologist also indicated that J .M. would be suggestible on the witness stand, seek to avoid conflict with authority figures, and at some point become "overwhelmed" in his attempts to understand concepts of the trial process.
*665 J.M.'s case manager from his school, an instructional specialist, also testified. She categorized his ability to comprehend and reason, to think abstractly and problem solve on an abstract conceptual level as being that of "a third grader, maybe fourth." J.M.'s school counselor further testified that J.M. told her that he knew he didn't commit this crime because his mother told him he didn't do it.
The court also heard the testimony of a psychiatrist who performed a two-hour court ordered competency evaluation of J.M. As stated in his written report, the psychiatrist's diagnostic impression of J.M. was "Mild Mental Retardation or Borderline Intellectual Functioning." The doctor reported that J.M. "was oriented to person, place and time," and concluded that "[a]n opinion that [J.M.] is marginally mentally competent to stand trial for the alleged offenses would find support." He immediately qualified that opinion, however, stating that "[i]ntellectually, he can follow the [court] proceeding to the degree his limited vocabulary allows." He cautioned that J.M.'s "reading level is low, scored near a first grade level in 1997. His inability to understand the language used will impair his motivation to attend to the process. He would need to be advised in simple language about many matters discussed in order to comprehend the process."
At trial, the doctor indicated that J.M. had been able to relate his version of events that led to the charges against him. He conceded, however, that he could not say whether J.M. had related an actual memory of the events, or something that had been told to the juvenile by others about the events. The doctor stressed in his testimony that a special effort would be necessary to ensure that J.M. could understand the trial process and assist counsel. It was his opinion that J.M. was "marginally competent, because I'm recognizing that he is a person who has special needs, that he needs education on issues, and providing that education is going to have to take a special path because of the way he learns and the way the information has to be presented to him. . . . So he's going to require a special approach." There was no detailed testimony from the doctor or any other witness, however, as to what that "special approach" might require or how it would work during the trial process.
The doctor also identified several potential problems in tutoring J.M. about the court process. He emphasized that J.M. does not learn easily or retain everything he learns for long periods of time. He noted that J.M. could become fixated on the first issue that came up and fail to comprehend subsequent issues as they arose. While the doctor opined that it was not "impossible" for an attorney to overcome J.M.'s limitations, he suggested that someone skilled in teaching, and communicating with, persons with J.M.'s deficits should work with the attorney. There was no testimony that anyone was available to provide such assistance.
In addition to his testimony concerning J.M.'s competence to stand trial, the psychiatrist also addressed J.M.'s competence to enter into a plea agreement. He observed, in this regard, that J.M. does not learn easily, that "his understanding of abstract concepts is minimal at best," and that these limitations were particularly relevant in the plea bargaining process, which he characterized as a "relatively abstract type of affair." He testified that it was not until the age of thirteen or fourteen that young adults begin to develop a capacity to think abstractly, and acknowledged that J.M. does not think in abstract terms. While suggesting that the concepts comprising a plea agreement could be broken down in a way that could be understood *666 by someone with limited abstract thinking ability, the doctor acknowledged that it would be difficult and time consuming.
Finally, when asked:
just to summarize your testimony, you're saying that a boy with an IQ of 65, a verbal IQ that falls within the first percentile, an ability to concentrate auditorily that falls within the point fifth percentile, a boy who will either acquiesce, make up something, or just shut down when he doesn't understand something, a boy who reads at a first grade level, a boy with a mental age of an eight-year-old, you're saying that you feel that a boy with all those deficits is competent to stand trial?
the doctor responded, "if you're referring to J.M., yes."
The standard for competency to stand trial is a familiar one. A competency determination measures whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); see also State v. Lockwood, 160 Vt. 547, 554, 632 A.2d 655, 660 (1993). The standard of competence for pleading guilty is the same as the standard for standing trial. See Godinez v. Moran, 509 U.S. 389, 396-99, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); Lockwood, 160 Vt. at 554, 632 A.2d at 660. Nevertheless, as the Supreme Court observed in Godinez, "when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted." 509 U.S. at 402, 113 S.Ct. 2680.
In reviewing a trial court's competency determination, we will uphold the court's findings if they are supported by substantial credible evidence and are not clearly erroneous. See State v. Thompson, 162 Vt. 532, 535, 650 A.2d 139, 141 (1994).
The sole evidence to support the court's conclusion that J.M. was competent to stand trial was the two hour competency evaluation by the forensic psychiatrist. Upon careful review, however, neither the report nor the witness's trial testimony can be found to support a finding of competency. The doctor concluded that J.M. was "marginally mentally competent to stand trial." He admitted, however, that he did not know if J.M.'s recitation of the facts of the charges were actually known by J.M., or the product of what others had told him concerning the charges. Indeed, the evidence indicated that although J.M. might be capable of recalling some basic concrete facts concerning the alleged offenses, he would routinely add details from other unrelated events. The evidence also suggested that J.M. would make up things so as not to appear stupid, and would not admit to a lack of understanding.
Most significantly, the psychiatrist's clinical assessment of "marginal competence" was virtually negated by caveat after caveat in his own testimony concerning the extraordinary efforts necessary to allow J.M. to follow meaningfully the proceedings. The psychiatrist readily acknowledged, and the evidence overwhelming showed, that J.M.'s lack of reasoning ability, knowledge, and verbal skills would significantly impair his ability to understand the trial process and assist his attorney.
The Court acknowledges that it is often difficult to accurately assess an adult defendant's capacity to understand his or her rights, that the problem is exacerbated when a child defendant is on trial, and that the task is truly daunting when the circumstances *667 also involve a diagnosis of mental retardation. The Court also recognizes that the very complexity of the situation demands a careful assessment of the multiple factors relevant to the issue of competency, and specific findings regarding those factors  findings which were lacking here. The Court identifies a number of these factors. In addition to the juvenile's age, education, background, and experience, they include the child's specific cognitive maturity, capacity for abstract reasoning, demeanor, ability to understand simple cause and effect relationships, appreciation of the various roles of the court and counsel, witnesses, and juries, reactions to stress, and memory and communication skills. See I. Mickenberg, Competency To Stand Trial and the Mentally Retarded Defendant: The Need for a Multi-Disciplinary Solution to a Multi-Disciplinary Problem, 17 Cal. W.L.Rev. 365, 392-401 (1981); V. Cowden & G. McKee, Competency to Stand Trial in Juvenile Delinquency Proceedings  Cognitive Maturity and the Attorney-Client Relationship, 33 J. Fam. L. 629, 646-47 (1995); J. Ellis & R. Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L.Rev. 414, 455-56 (1985).
Applying these factors here, it is impossible to conclude that the evidence supported a finding of competency. The minor's cognitive age was that of a first-grader. His psychological profile indicated that he could barely read or write, that he had no real understanding of trial procedure or the potential consequences of trial, that his language and communication skills were minimal, that his ability to attend to lengthy trial proceedings was limited, and that he would distort events to avoid conflict or the appearance of incompetence. There was no evidence that the minor had any prior experience with criminal procedure or the trial process. Thus, the Court's conclusion that, despite the absence of findings, the record evidence was sufficient to support a finding of competency, is incomprehensible.
In the end, the "marginal" finding of competence in this case rests entirely upon the psychiatrist's suggestion that someone trained to deal with individuals with such cognitive deficits might be able to facilitate his understanding, and the Court's directive  based on this suggestion  that someone, somehow must be provided to assist this minor on remand. Yet no evidence was offered at trial as to what such assistance might actually require, who specifically would be qualified to render it, or how  as a practical matter  it would be provided during the course of trial. The Court, not surprisingly, provides no guidance either, leaving it to the trial court and the parties to puzzle through the Court's mandate.
This is a thin reed upon which to rest a holding. As noted, a finding of legal competence to stand trial requires a "rational as well as factual understanding of the proceedings," and a "sufficient present ability to consult with [a] lawyer with a reasonable degree of rational understanding." Dusky, 362 U.S. at 402, 80 S.Ct. 788 (emphasis added). The possibility that a "cognitive facilitator" might overcome the myriad obstacles to this juvenile's rational capacity to assist in his own defense does not, in my view, satisfy this standard.
Accordingly, I would reverse the judgment. I am authorized to state that Justice Johnson joins in this dissent.
NOTES
[*] Because the defendant in Johnny P. was waiving his right to a trial and entering a plea, it was proper to appoint the psychiatric specialist to facilitate communication between the court and the defendant. In this case, the role of a communication specialist, if needed, would be to ensure that effective communication was possible between J.M. and his attorney.